**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

     v.

SERGEI POLEVIKOV,

          Defendant.

Case No. 21 Cr. 774 (LJL)

**SENTENCING MEMORANDUM ON BEHALF OF**
**DEFENDANT SERGEI POLEVIKOV**

**LANKLER SIFFERT & WOHL LLP**
Michael Gerber
Jeannie Rose Rubin
500 Fifth Avenue
New York, NY 10110
(212) 921-8399

*Attorneys for Defendant Sergei Polevikov*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ........................................................................................................... 2

I.     Sergei's Personal History.................................................................................... 2

        A.     Childhood and Education.............................................................. 3

        B.     Immigration to the United States ................................................. 6

        C.     Devotion to Maryna and Their Children....................................... 9

        D.     Unwavering Support of His Family in Belarus.............................. 13

        E.     Dedication to Helping the People of Belarus................................. 14

        F.     Founding of WellAI to Help Patients and Physicians ................... 16

        G.     Contributions to His Community.................................................. 18

II.    Sergei's Offense Conduct and Conviction......................................................... 20

III.   The Consequences of Sergei's Conviction ........................................................ 20

ARGUMENT .............................................................................................................. 22

I.     The Court Should Impose a Sentence of at Most Two Years............................. 22

        A.     The Guidelines Range Is Unreasonably High.............................. 23

                1.     *The Guidelines' emphasis on the amount of gain yields a*
                         *draconian range.*.................................................................. 23

                2.     *Insider trading sentences are almost uniformly below-Guidelines.* ......... 26

        B.     A Sentence of at Most Two Years Is Appropriate in Light of Sergei's
             Personal History and Characteristics .......................................... 28

        C.     A Sentence of at Most Two Years Will Fully Serve the Objectives of
             Sentencing.................................................................................. 32

                1.     *Sergei is a first-time offender who poses no danger of recidivism.* ......... 32

                2.     *A prison term of at most two years will promote respect for the law*
                          *and effect general deterrence.*................................................ 33

3. *A sentence of at most two years accounts for the seriousness of the offense.* ................................................................................... 35

4. *A lengthier sentence would be counterproductive because educational programs available to Sergei in prison would not further his rehabilitation.* .......................................................... 36

D. A Sentence of at Most Two Years Will Avoid Unwarranted Sentencing Disparities ................................................................................. 37

E. Any Term of Imprisonment Will Be Harsher as a Result of the Pandemic .......... 40

II. A Fine Is Not Warranted in This Case ............................................................ 41

CONCLUSION .......................................................................................... 43

# TABLE OF AUTHORITIES

**Cases**

*Gall v. United States,*
    552 U.S. 38 (2007)................................................................................30

*Kelly v. United States,*
    140 S. Ct. 1565 (2020)..........................................................................29

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)...........................................28, 35

*United States v. Algahaim,*
    842 F.3d 796 (2d Cir. 2016).................................................................25

*United States v. Bills,*
    401 F. App'x 622 (2d Cir. 2010)..........................................................29

*United States v. Blaszczak,*
    141 S. Ct. 1040 (2021).........................................................................29

*United States v. Blaszczak,*
    No. 17 Cr. 357 (S.D.N.Y. Sept. 13, 2018)...............................29, 30, 38

*United States v. Chow,*
    No. 17 Cr. 667 (S.D.N.Y. Jan. 17, 2019)..................................... *passim*

*United States v. Cohen,*
    No. 19 Cr. 741 (S.D.N.Y. June 9, 2020)...........................................38, 39

*United States v. Collins,*
    No. 07 Cr. 1170 (S.D.N.Y. July 15, 2013) .........................................34

*United States v. Corsey,*
    723 F.3d 366 (2d Cir. 2013).................................................................25

*United States v. Emmenegger,*
    329 F. Supp. 2d 416 (S.D.N.Y. 2004).................................................24

*United States v. Faibish,*
    No. 12 Cr. 265 (E.D.N.Y. Mar. 10, 2016) ..........................................24

*United States v. Gaind,*
    829 F. Supp. 669 (S.D.N.Y. 1993) ......................................................34

*United States v. Galante,*
    111 F.3d 1029 (2d Cir. 1997)..............................................................28

*United States v. Graham,*
    No. 06 Cr. 137 (D. Conn. Apr. 30, 2009) ..................................................... 34

*United States v. Gupta,*
    904 F. Supp. 2d 349 (S.D.N.Y. 2012) .......................................................... 24

*United States v. Isola,*
    548 F. App'x 723 (2d Cir. 2013) .................................................................. 28

*United States v. Johnson,*
    964 F.2d 124 (2d Cir. 1992) ......................................................................... 28

*United States v. Johnson,*
    No. 16-CR-457-1, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ............... 24

*United States v. Lavidas,*
    19 Cr. 716 (S.D.N.Y. June 16, 2020) .......................................................... 39

*United States v. Nesbeth,*
    188 F. Supp. 3d 179 (E.D.N.Y. 2016) ......................................................... 33

*United States v. Robles,*
    No. 08 Cr. 1114, 2021 WL 3524067 (S.D.N.Y. Aug. 10, 2021) ...........40, 41

*United States v. Schulman,*
    No. 16 Cr. 442 (E.D.N.Y. Sept. 26, 2017) .................................................. 34

*United States v. Stewart,*
    590 F.3d 93 (2d Cir. 2009) ........................................................................... 33

*United States v. Stewart,*
    No. 15 Cr. 287 (S.D.N.Y. May 4, 2016) ...........................................30, 39, 40

*United States v. Zhong,*
    26 F.4th 536 (2d Cir. 2022) ......................................................................... 41

**Statutes & Guidelines**

18 U.S.C. § 3553(a) ................................................................................... *passim*

18 U.S.C. § 3572(a) ....................................................................................41, 42

U.S.S.G. § 2B1.4 ..................................................................................25, 26, 27

U.S.S.G. § 5E1.2 .........................................................................................41, 42

**Other Authorities**

U.S. Sentencing Commission, 2016 Annual Report and Sourcebook of Federal
    Sentencing Statistics ...........................................................................................27

U.S. Sentencing Commission, 2017 Annual Report and Sourcebook of Federal
    Sentencing Statistics ...........................................................................................27

U.S. Sentencing Commission, 2018 Annual Report and Sourcebook of Federal
    Sentencing Statistics ...........................................................................................27

U.S. Sentencing Commission, 2019 Annual Report and Sourcebook of Federal
    Sentencing Statistics ...........................................................................................27

U.S. Sentencing Commission, 2020 Annual Report and Sourcebook of Federal
    Sentencing Statistics ...........................................................................................26

U.S. Sentencing Commission, 2021 Annual Report and Sourcebook of Federal
    Sentencing Statistics .....................................................................................26, 27

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A
    Review of Research 28-29 (2006) ........................................................................35

Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines
    Sentencing Reform (Punishment Purposes),* 58 Stan. L. Rev. 67, 80 (2005) .........35

Susan B. Glasser, "Belarus Chief Responds to Critics With Crackdown,"
    WASHINGTON POST (Aug. 19, 2002)........................................................................7

U.S. State Department, Bureau of Democracy, Human Rights, and Labor, 2002
    Country Report on Human Rights Practices, Belarus (Mar. 31, 2003) ...................7

## PRELIMINARY STATEMENT

Sergei Polevikov stands before this Court with shame and deep remorse.  He engaged in front-running for years.  Sergei has taken full responsibility for this conduct and makes no excuses for this serious crime.  He pled guilty at the outset of the prosecution and has already met his forfeiture obligation in this case.

As a result of his crime, Sergei's life is in shambles.  He is a convicted felon.  He is publicly disgraced.  The financial outlook for his family is grim.  And Sergei knows that because of the seriousness of his offense, he will serve a prison sentence.  His wife Maryna, who has been out of the workforce for decades and is unlikely to secure employment above the minimum wage, will become the sole provider for the family during Sergei's imprisonment.  ███

████████████████████████████████████████████████████████████████

███  His parents are distraught and afraid.  Sergei's guilt over his actions and worry about his family ████████████████████████████.

Sergei's crime has destroyed a life and career that were otherwise filled with kindness, generosity, and hard work.  The dozens of letters submitted in support of Sergei describe character and conduct in matters large and small, over the course of many years, that are completely at odds with his crime.  His life has been dedicated to serving others—his family, his community, and the people of his native Belarus.  When he left the securities industry in 2019, he co-founded a start-up healthcare technology company designed to help underserved patients.  Over decades, Sergei has devoted tremendous time and effort to advocating for democracy and human rights in Belarus and to helping Belarusian dissidents subject to political persecution.  He is fully dedicated to this cause and now more than ever hopes that he can continue this work in the future.  As the letters reflect, people who have known Sergei in various contexts over the years were shocked by the offense conduct and saddened that a person with so much talent,

compassion, and drive to help those in need has put himself and his family in this terrible situation.

In light of these considerations, we respectfully submit that a below-Guidelines prison sentence of at most two years is sufficient, but not greater than necessary, to satisfy the purposes of sentencing in this case.  18 U.S.C. § 3553(a).  This would be a substantial prison term, particularly for a defendant who has no criminal history, and would reflect the seriousness of the offense.  Indeed, sentencing data demonstrate that such a sentence would be a severe punishment when compared to sentences imposed in other insider trading cases.

As Sergei's letter to the Court reflects, he knows that he has no one but himself to blame for his current situation.  He knows that what he did was wrong and deeply regrets violating his employer's trust and inflicting grave harm on his family.  Whatever the sentence, Sergei will spend the rest of his life trying to make up for what he has done.  A prison term of at most two years would reflect the seriousness of the offense while also capturing the mitigating considerations that call for the Court's mercy.

## BACKGROUND

### I.      Sergei's Personal History

Sergei has lived a life of sacrifice and kindness.  In the words of Sergei's wife, Maryna: "Sergei would always give the last thing he has to someone who needs help."  (Ex. A-2, Maryna Arystava Ltr. at 2).   After a difficult childhood behind the Iron Curtain, Sergei left Belarus by himself to study and build a life for himself and his family in the United States.  His time in this country over the last 25 years has been defined by devotion to family, generosity, and tireless efforts to help others.

## A.  Childhood and Education

Sergei was born in 1973 in Belarus, which was then part of the Soviet Union.  He grew up in Minsk with his father Viktor Polevikov, his mother Valentina Polevikova, and his younger brother Yury.  Viktor is a professor of mathematics at Belarusian State University.  (PSR ¶¶ 41-42).  Valentina worked as an engineer in a semiconductor plant and later as a full-time trade union representative.  Valentina recalls that the family "never chased after material possessions." (Ex. A-5, Valentina Polevikova Ltr. at 1).  Instead, Sergei's parents emphasized "care, support, trust and love for one another."  (Ex. A-5, Valentina Polevikova Ltr. at 1).  Viktor and Valentina also emphasized academic achievement.  Sergei's father "instilled in Sergei a love of mathematics and a passion for science."  (Ex. A-5, Valentina Polevikova Ltr. at 1).  Valentina recalls often waking up to find Sergei and Viktor discussing scientific papers, surrounded by papers scribbled with mathematical formulas.  (Ex. A-5, Valentina Polevikova Ltr. at 1).  Sergei and Viktor have even published two scientific articles together.  (Ex. A-6, Viktor Polevikov Ltr. at 2).

Despite his parents' best efforts, Sergei's childhood was hard.  The family's income was at times "below subsistence level."  (Ex. A-6, Viktor Polevikov Ltr. at 1).  They experienced frequent shortages of food and basic necessities.  (*See* Ex. A-2, Maryna Arystava Ltr. at 1). Because Viktor and Valentina refused to join the Communist Party, they were denied food benefits and discounts that were available to party members.  They endured long lines to buy food and supplies and usually were limited to low-cost foods such as potatoes.  (PSR ¶¶ 41, 43).

He was humiliated and ridiculed not only by

classmates, but also by teachers.  (Ex. A-5, Valentina Polevikova Ltr. at 2).  ███████

███████████████████████████████████████   ███████████████████████

███████████████████████████████████████████   ██████████████

███████████████████████

Perhaps the most damaging event of Sergei's childhood was the Chernobyl disaster in April 1986, in which he was directly exposed to dangerous levels of radiation.  Sergei was 13 years old, and his parents had dropped him off to spend the week at his grandmother's house, 20 miles from the Chernobyl nuclear plant.  The Soviet government kept the disaster secret for days. (PSR ¶ 54; Ex. A-7, Judith Becker Ltr. at 3).  Just hours after the nuclear accident, Sergei was unknowingly brushing radioactive dirt off his grandmother's cows.  (Ex. A-7, Judith Becker Ltr. at 3).  ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████  (PSR ¶ 54; Ex. A-12, Sandra Godfrey Ltr. at 1).

Despite these hardships, even as a child, Sergei looked after others.  His younger brother Yury recalls that Sergei always protected him and made him feel safe:

> All my childhood I was under the protection of my older brother.  Our school was five kilometers away from home, and every day for ten years in a row Sergei took me to school and brought me home after classes.  We lived in a troubled area during the collapse of the Soviet Union.  Banditry, poverty and hunger flourished on the streets, but thanks to Sergei, I felt safe.  He never gave me a hard time.  I was always protected.

(Ex. A-25, Yury Polevikov Ltr. a 1).  Viktor recalls that Sergei always was a "very caring son and grandson."  (Ex. A-6, Viktor Polevikov Ltr. at 2).  Even during his childhood and college, Sergei often visited his grandparents, who had moved to a home about 50 kilometers from Minsk, to provide them with "all possible assistance."  (Ex. A-6, Viktor Polevikov Ltr. at 2).

Sergei also excelled academically, due to his rigorous work ethic and voracious appetite for learning.  In 1995, he graduated with honors from Belarusian State University ("BSU"), with degrees in applied mathematics and economic cybernetics, and was admitted to a Ph.D. program at BSU in applied mathematics.  His adviser, Professor Kalinin, recalls Sergei as one of his best students because of his "hard work, his intellectual curiosity, his love for mathematics, his respect for his classmates, his openness and his honesty."  (Ex. A-16, Anatoly Kalinin Ltr. at 2). In his final year at BSU, Sergei lived with his parents and worked at a bank to help support the family.  (Ex. A-6, Viktor Polevikov Ltr. at 1).  At the same time, Sergei attended evening courses to improve his English.  (Ex. A-6, Viktor Polevikov Ltr. at 1).  His father recalls that for a year Sergei rarely went to bed before 3 a.m.  (Ex. A-6, Viktor Polevikov Ltr. at 1).

Sergei's hard work was rewarded with a grant from the Edmund Muskie Foundation to fund a master's program in the United States.  (Ex. A-6, Viktor Polevikov Ltr. at 2).  In 1995, Sergei entered a two-year master's program at Southern Methodist University ("SMU") in Dallas on a full scholarship.  (Ex. A-6, Viktor Polevikov Ltr, at 2; Ex. A-16, Anatoly Kalinin Ltr. at 1). Sergei set out "alone to a distant country with a backpack of personal belongings and books" to continue his studies at SMU.  (Ex. A-5, Valentina Polevikova Ltr. at 2).

After receiving his master's degree in applied economics from SMU, Sergei earned two additional master's degrees: a master's degree in economics from the University of Houston[1] in 2001 and a Master of Business Administration degree from the University of Rochester in 2004. (PSR ¶ 59).  Sergei excelled as a student, and he has continued to pursue his passion for math and science to this day, publishing peer-reviewed articles on various topics over the years.  (*See*

---

[1] Sergei began his economics program at Rice University before transferring to the University of Houston.

Ex. A-8, Daniel Burnside Ltr. at 1 (describing Sergei as an "exceptional student"); Ex. A-16, Anatoly Kalinin Ltr. at 1-2 (noting that "Sergei's curiosity and his desire to learn have expanded his scientific knowledge tremendously," and that he has "worked on top academic research and published it in peer-reviewed journals"); Ex. A-9, W. Michael Cox Ltr. at 2 ("Sergei was the best student in my class.")).

While in master's programs in the United States, Sergei also pursued his Ph.D. at BSU. Although he "did very well in his coursework and his Ph.D. thesis" (Ex. A-16, Anatoly Kalinin Ltr. at 1), he was ultimately unable to defend his thesis because the political climate at the time made it dangerous for him to return to Belarus. (Ex. A-28, Rudi Schadt Ltr. at 1).

### B.  Immigration to the United States

Sergei initially entered the United States in 1995 on a student visa to attend SMU. (PSR ¶ 44). During the late 1990s and early 2000s, however, it became increasingly dangerous for him to return to Belarus as a result of his mother's political activism and his own.

After the collapse of the Soviet Union, Belarus enjoyed democratic reforms for only a few years before Alexander Lukashenko became President in 1994. At that time, Valentina had been working as a union representative and became increasingly involved in women's rights advocacy. In 1994, Valentina founded the Belarusian Party of Women, called "Nadzeya" (meaning "hope" in Belarusian), to advocate for women's rights. As Lukashenko's authoritarian regime cracked down on opponents, Nadzeya evolved into an opposition party and became part of a Belarusian coalition of democratic forces. In 1995, Valentina was a candidate for Parliament but lost to an ally of Lukashenko. She led the Nadzeya party until 2001, and then continued to serve as an opposition leader, placing herself and her family in danger. (Ex. A-5, Valentina Polevikova Ltr. at 1, 3; Ex. A-11, Alexander Dabravolski Tr. at 1).

In 2001, Valentina served as campaign manager for Vladimir Goncharik, the candidate for President against Lukashenko. Lukashenko won reelection under circumstances widely regarded as fraudulent. In the aftermath of that election, Lukashenko took revenge on perceived enemies. Valentina was forced to leave her job at the trade union federation. On the evening of June 9, 2002, Viktor Polevikov was on his way home from work when he was attacked by two assailants. He was severely beaten and left unconscious. Viktor did not see his attackers, and no arrest was ever made. The incident was reported in a 2002 *Washington Post* article[2] and a U.S. State Department Belarus Country Report on Human Rights Practices published in March 2003,[3] along with other incidents of systematic harassment, arrests, and attacks by Lukashenko's henchmen targeting people connected to the opposition. (*See also* PSR ¶ 42; Ex A-6, Viktor Polevikov Ltr. at 2).

Valentina, however, was undeterred in her fight for democracy in Belarus. She continued her work to oppose Lukashenko's dictatorship, at great cost to her personal safety. For example, in 2006, Valentina was arrested and jailed for 15 days for her participation in protests after Lukashenko won yet another election perceived as rigged. (Ex. A-11, Alexander Dabravolski

---

[2] The article states, in relevant part, that "the husband of Valentina Polevikova, the opposition's campaign manager, [] found himself drenched in blood and lying under a tree at 4 a.m. one recent morning after being severely beaten by mysterious assailants." It also notes that Valentina was forced to leave her job. Susan B. Glasser, "Belarus Chief Responds to Critics With Crackdown," WASHINGTON POST (Aug. 19, 2002), available at https://www.washingtonpost.com/archive/politics/2002/08/19/belarus-chief-responds-to-critics-with-crackdown/e910688e-33a9-4f49-ad17-88f1e54ac48e/.

[3] U.S. State Department, Bureau of Democracy, Human Rights, and Labor, 2002 Country Report on Human Rights Practices, Belarus (Mar. 31, 2003), available at https://2009-2017.state.gov/j/drl/rls/hrrpt/2002/18354.htm ("On the evening of June 9, the husband of United Social Democratic Party (USDP) leader Valentina Polevikova was beaten up in the evening as he exited a trolley bus to return home. He did not see his attackers, and regained consciousness the following morning lying on the compound of a nearby kindergarten.").

Ltr. at 1). To this day, Valentina remains a leader in the fight against Lukashenko's autocratic regime, currently serving as a member of a committee advising opposition leader Sviatlana Tsikhanouskaya. (PSR ¶ 41). Last year, she and her son Yury (Sergei's brother) fled Belarus after Yury was arrested and a police search of his home revealed evidence of their opposition activities. Valentina and Yury are now refugees in Lithuania. (PSR ¶ 41; Ex. A-5, Valentina Polevikova Ltr. at 3-4; Ex. A-25, Yury Polevikov Ltr. at 2).

Sergei's own political activism also started in the mid-1990s, around the time when Lukashenko came to power. As a student at BSU, he participated in anti-government protests and pro-democracy student groups. In 1995, he helped his mother in her Parliamentary campaign. (Ex. A-5, Valentina Polevikova Ltr. at 1). Even after leaving Belarus for the United States, Sergei continued to assist Belarusian opposition candidates. For example, in the 2001 presidential campaign, he acted as an unpaid consultant to Vladimir Goncharik in Goncharik's campaign against Lukashenko, produced campaign materials, and developed the candidate's election website. In addition, from the late 1990s to the early 2000s, Sergei published information about government repression, human rights violations, and election irregularities in Belarus. As a result of Sergei's political activities, Alexander Lukashenko personally attacked Sergei in a public speech, calling him the "Western saboteur," and alleged that Sergei was part of a Western plot against Belarus. Commentators on state-run mass media hurled insults and threats at Sergei and his family.[4]

---

[4] These facts are described in letters provided by Vladimir Goncharik and by Stanislav Shushkevich (who served as the first head of state of independent Belarus from 1991 to 1994) in March 2002 in support of Sergei's political asylum application. Those letters are annexed to this memorandum as Exhibits C and D respectively.

Because of Valentina's and Sergei's political activities, by the early 2000s it was clear that it would be dangerous for Sergei to return to Belarus.  In 2002, Sergei and Maryna applied for and received political asylum in the United States.  In 2011, they became citizens.  (PSR ¶ 44; Ex. A-1, Sergei Polevikov Ltr. at 2; Ex. A-12, Sandra Godfrey Ltr. at 1-2).

Sergei describes the day that he and Maryna became United States citizens as the proudest day of his life.  (Ex. A-1, Sergei Polevikov Ltr. at 2).  Sergei's friends also recall his excitement and gratitude to be an American citizen.  (*See* Ex. A-8, Daniel Burnside Ltr. at 1; Ex. A-9, W. Michael Cox Ltr. at 3-4).  Even today, his colleague Dr. Culpepper writes that Sergei cherishes freedom and that he "can hardly have a conversation [with Sergei] in which he does not express the greatness of America."  (Ex. A-10, Dr. Guy Culpepper Ltr. at 2).

### C.  Devotion to Maryna and Their Children

Sergei and Maryna grew up together in Minsk and have been close friends since the first grade, when they were seven years old.  (Ex. A-1, Sergei Polevikov Ltr. at 1; Ex. A-2, Maryna Arystava Ltr. at 2).   Maryna's childhood and early adulthood in Belarus were fraught with trauma.  Her father was an alcoholic, and her mother filed for divorce when Maryna was in sixth grade.  As a single parent, Maryna's mother worked 60-80 hours per week.  Maryna and her brother Andrei tried to help their mother however they could, including by caring for their visually impaired grandmother who lived with them.  At age 14, Maryna got a special permit and started working at the post office to help support the family.  (Ex. A-2, Maryna Arystava Ltr. at 1).

Andrei, however, struggled.  ███████████████████████████████████████ ████████████████████████████████████████████████  Although Andrei was able to pull his life together and build a successful apartment repair business in his

early 20s, his life was cut short.  Andrei was murdered at age 26, when Maryna was just 17 years

old.  (Ex. A-2, Maryna Arystava Ltr. at 1; PSR ¶ 45).

Shortly after Andrei's funeral, Maryna's mother was diagnosed with an untreatable brain

tumor.  Maryna cared for her mother as she suffered for five years until her death.  At age 22,

Maryna then was left alone to care for her blind grandmother.  (Ex. A-2, Maryna Arystava Ltr. at

1).

Maryna writes that there are "no words" to thank Sergei for the support he has provided

over the years.  (Ex. A-2, Maryna Arystava Ltr. at 2).  He has always been there for her, ready to

listen and help in any way possible.  For example, she recalls:

> When I was very busy in college, Sergei would visit my sick mother.  They would
> drink tea, talk for a long time, tell jokes to each other.  My mother came alive
> during these visits with Sergei.  Even when Sergei went away to study in the U.S.
> he always found time to call me to see how I was doing, to listen and to cheer me
> up. . . .  Sergei always knows how to find the right words to help me cope with all
> the difficulties in my life.

(Ex. A-2, Maryna Arystava Ltr. at 2).

In 1999, after many years of friendship, Sergei proposed to Maryna.  (Ex. A-2, Maryna

Arystava Ltr. at 2).  In 2000, Maryna left her life in Belarus behind and moved to Texas to marry

Sergei and begin their life and family together.  (Ex. A-2, Maryna Arystava Ltr. at 2).

Throughout their 22-year marriage, Sergei's devotion to Maryna has been clear to all who

know him.  They are, as one friend describes it, "[s]oulmates."  (Ex. A-18, Elizabeth Knudsen

Ltr. at 1).  Julia Gu, a former colleague of Sergei, recalls his adoration of Maryna:

> Even before I met Sergei's family, it was clear how much Sergei loved and cared
> about them.  I knew so much about his wife, Maryna, before I ever met her in
> person.  Sergei talked about his family with love all the time . . . .  I knew how
> Sergei and Maryna met in Belarus, how she was the "cool, smart one," and Sergei
> was just this "dumb, tall guy."  I knew how Maryna protected him from being
> bullied in his teenage years. . . .  One day at work he was very excited to show me
> the cake he bought for Maryna's birthday from a bakery downstairs.  There was

10

only one bakery downstairs, so everyone at work had already tasted every cake from that store. But he was still very excited to share with his family.

(Ex. A-13, Julia Gu Ltr. at 2; *see also* Ex. A-9, W. Michael Cox Ltr. at 4).

Since his arrest, Maryna has stood by Sergei. Sergei writes that he loves her more than life, and he plans to spend the rest of his life trying to make up for the harm that his crime has caused her and earn the love and support that she has given him. (Ex. A-1, Sergei Polevikov Ltr. at 1-2).

Sergei and Maryna's world revolves around their two daughters: Brittany (21) and E█ (14). Brittany and E█ already have faced, and continue to face, significant challenges. Sergei has dedicated his life to loving and supporting them. (Ex. A-2, Maryna Arystava Ltr. at 2-5; Ex. A-18, Elizabeth Knudsen Ltr. at 1-2; Ex. A-17, Alexandra Kishkovsky Ltr. at 1; Ex. A-9, W. Michael Cox Ltr. at 4).



Those who knew Sergei when E█ was born in 2007 recall how focused he was on helping his family. Alexandra Kishkovsky, the wife of Sergei's then-pastor, recalls Sergei as "a loving and devoted father, totally distraught and praying for █████████." (Ex. A-17, Alexandra Kishkovsky Ltr. at 1). Daniel Burnside describes Sergei as "an extremely committed

family man," and observes that "if you really wanted to see his priorities in action, you wanted to talk to him when his youngest daughter E████ was born."  (Ex. A-8, Daniel Burnside Ltr. at 2).



Unfortunately, the hardships did not end█████████████████████████████████

"But no matter their challenges, it was obvious how much he loved his family."  (Ex. A-13, Julia Gu Ltr. at 2).

Sergei's bond with his daughters shines through the dozens of letters submitted to the Court.  Brittany writes that some of her fondest memories from childhood are her adventures with her father, and how her father's work ethic and desire to better himself have inspired her in

her studies and other endeavors.  (Ex. A-4, Brittany Polevikov Ltr. at 1).  ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████

Sergei's commitment and joy in parenting his daughters are obvious to anyone who has seen them.  For example, neighbors Katie Hangley and Howard Simon write that from their vantage point across the street, they have seen how Sergei and Maryna "made their family their priority":

> He has been the dad who made his schedule work so he could be there for all the school events, big games, and shows. . . .  But the thing we've been most impressed by, since the family moved in, is how much Sergei *plays* with his kids. Sledding, playing tag, building snowmen, biking, running, playing tennis, ice skating – they have *fun* together.  Sergei is well over six feet tall, and to see him loping around the corner of the house and hurdling over a row of shrubs while the girls run shrieking after him is a joy.

(Ex. A-14, Katie Hangley & Howard Simon Ltr. at 2).  Denis Nakazawa, a friend of the family, similarly notes that as a regular at gatherings at the Polevikov home, he had "ample opportunity to observe" what a "wonderful" father and husband Sergei is.  "Jokes are constantly being thrown about, laughter fills the room, and an atmosphere of joy and comfort is always around in Sergei's presence."  (Ex. A-21, Denis Nakazawa Ltr. at 1).  (*See also* Ex. A-9, W. Michael Cox Ltr. at 4; Ex. A-10, Dr. Guy Culpepper Ltr. at 1-2; Ex A-18, Elizabeth Knudsen Ltr. at 1-2).

████████████████████████████████████████████████████████

### D.  Unwavering Support of His Family in Belarus

Even though Sergei has lived in the United States for over 25 years, he always has provided his family in Belarus with love and support and helped them in any way he could.

The letters of his mother Valentina, his father Viktor, his brother Yury, and his nephew Vadim describe the myriad ways that Sergei has assisted them over the years.  Sergei has reliably

13

helped his family in numerous ways, including, most recently, helping Valentina and Yury flee political persecution in Belarus and resettle in Lithuania last year.  Yury writes that "[i]f not for Sergei, I am confident we would all be in a Belarus prison now."  (Ex. A-25, Yury Polvikov Ltr. at 2).  In fact, when Sergei was arrested at the airport in September 2021 for front-running, he was on his way to Lithuania to help his mother and brother settle into their new life as refugees in Vilnius, and to help his mother ███████████████.  (Ex. A-5, Valentina Polevikova Ltr. at 4).

Sergei is deeply ashamed that now that his parents are in their 70s and have health issues—when they need him most—he will not be able to assist them because of his crime.  (Ex. A-1, Sergei Polevikov Ltr. at 2).

### E.  Dedication to Helping the People of Belarus

For three decades, the fight to support democracy and human rights in Belarus, and to improve the lives of Belarusians, has been central to Sergei's life.  In addition to his political activities described above, Sergei has devoted time and resources to supporting his mother's endeavors on behalf of the people of Belarus.  Even as a graduate student, "Sergei cared about his mother's work and had sympathy for the women she was trying to help."  (Ex. A-7, Judith Becker Ltr. at 1).  Judith Becker writes of several projects she worked on with Valentina in the late 1990s and early 2000s to help Belarusian women, and the essential roles that Sergei played in facilitating those projects.  He set up phone calls between Valentina and Ms. Becker and translated for them.  (Ex. A-7, Judith Becker Ltr. at 2).  He worked with Ms. Becker and Valentina to organize an entrepreneurship seminar for Belarusian women, taught by Sergei's entrepreneurship professor from SMU.  (Ex. A-7, Judith Becker Ltr. at 2).  And when Ms. Becker and Valentina raised funds to provide food baskets to Belarusian widows at Christmas, Sergei delivered baskets to the widows while in Belarus over a winter break from SMU.  (Ex. A-

14

7, Judith Becker Ltr. at 2).  Ms. Becker recalls that Sergei, "a deeply sensitive and caring person," was touched by the experience of giving out baskets.  (Ex. A-7, Judith Becker Ltr. at 1-2).

Sergei also has supported Valentina's work in innumerable other ways over the years. For example, he assisted Valentina in supporting opposition activists persecuted and imprisoned by the Lukashenko regime (Ex. A-30, Katsiaryna Tkachenka Ltr. at 1); assisted Valentina with expenses to enable her to teach as part of the Council of Europe's Youth for Democracy program (Ex. A-7, Judith Becker Ltr. at 3); gave lectures as part of that same program without accepting any compensation (Ex. A-7, Judith Becker Ltr. at 3; Ex. A-11, Alexander Dabravolski Ltr. at 2); and at Valentina's request, flew to Belarus and conducted a workshop for Belarusian civic activists to introduce them to Western financial systems.  (Ex. A-26, Junela Salnikava Ltr. at 1).

Sergei has worked closely with other Belarusian Americans to educate Congress and government agencies about the situation in Belarus and to advocate for free elections and human rights.  Another individual involved in that effort, Irina Zavina-Tare, writes that she and Sergei believed it was their moral obligation as Americans to support the fight for democracy, but they had no background or organization to guide them.  (Ex. A-32, Irina Zavina-Tare Ltr. at 1).  Ms. Zavina-Tare's letter details Sergei's extensive efforts on behalf of a democratic Belarus.  (Ex. A-32, Irina Zavina-Tare Ltr. at 1).  Ms. Zavina-Tare notes that Sergei's absence will be felt in their continuing advocacy efforts.  (Ex. A-32, Irina Zavina-Tare Ltr. at 2).

In addition to his advocacy, Sergei has provided financial support and other assistance to activists in Belarus.  (Ex. A-32, Irina Zavina-Tare Ltr. at 2).  One of those activists, Volha Niakhaichyk, has submitted a letter describing how Sergei helped her and her daughter when they had to escape Belarus quickly to avoid persecution and resettle in Lithuania.  (Ex. A-23,

Volha Niakhaichyk Ltr. at 1).  The letter also describes Sergei's help in organizing on-line

meetings among activists and democratic forces, his funding the purchase of a power generator

to enable activists in Lithuania to engage in protests against the Lukashenko regime, and his

providing financial support to a mother of five who is a political prisoner in Belarus.  (Ex. A-23,

Volha Niakhaichyk Ltr. at 1; Ex. A-31, Francisak Viacorka Ltr. at 1 (noting that Sergei is a

"devoted advocate for human rights and democratic values" who was "committed to helping

Belarusians who fled the country hiding from repressions" and has devoted "hundreds of hours"

to those causes); Ex. A-25, Yury Polevikov Ltr. at 2 (explaining that "[i]t is no secret that Sergei

made a huge contribution to the fight against the dictatorship in Belarus," including by helping

political prisoners and their families); Ex. A-32, Irina Zavina-Tare Ltr. at 2 (explaining that

Sergei provided guidance and financial support to help activists escape Belarus, resettle, and find

jobs)).

        Sergei's commitment to the Belarusian people, and concern about the deepening crisis in

Eastern Europe, is greater now than ever.  He is saddened and ashamed that as a result of his

crime he will be unable to assist the movement for democracy in Belarus for the foreseeable

future.

### F.  Founding of WellAI to Help Patients and Physicians

        Sergei's most recent business endeavor also reflects his desire to help others.  After he

lost his analyst position in 2019, Sergei chose not to take another job in finance.  Instead, he co-

founded a health technology start-up company, WellAI, dedicated to helping doctors and patients

by providing diagnostic tools powered by artificial intelligence.  (Ex. A-27, Daniel Satchkov Ltr.

at 1; PSR ¶¶ 50, 62).  His decision to pursue this endeavor and the way he has run the company

reflect his core values.

Sergei co-founded WellAI in 2020 with his friend Daniel Satchkov. (Ex. A-27, Daniel Satchkov Ltr. at 1). Daniel explains that in the past, he and Sergei both had devoted significant time to reading and researching medical literature—in Daniel's case to deal with his own medical issues, and in Sergei's case researching ███████████████. (Ex. A-27, Daniel Satchkov Ltr. at 1). Sergei and Daniel wanted to use their experiences to help others receive better healthcare. (Ex. A-27, Daniel Satchkov Ltr. at 1). Through WellAI, they are using machine learning "to create a mathematical model that could summarize millions of medical studies, help doctors avoid mistakes and empower patients." (Ex. A-27, Daniel Satchkov Ltr. at 1). One of the primary goals of WellAI is to "bring better healthcare to patients who do not have access to physicians." (Ex. A-10, Dr. Guy Culpepper Ltr. at 1).

In building WellAI, Sergei and Daniel consistently have been motivated by their desire to help people, not to maximize personal profit. For example, although they were advised that to maximize the company's sale value they should include in the company's privacy policy a provision that would enable them to monetize users' personal data, they rejected that advice because it was not in the interest of the users. (Ex. A-27, Daniel Satchkov Ltr. at 1). In addition, Dr. Guy Culpepper, a family physician in Texas who now works with WellAI, writes about how Sergei and Daniel approached him to offer help in his treatment of COVID-19 patients during the pandemic:

> During the early months of the pandemic, I searched daily for information to help my Covid-19 patients. I joined several research groups who were sharing early information about the pandemic, and I participated in podcasts to share what I had learned.
>
> In April of 2020, after speaking on a podcast about the impact of Covid-19 on primary care, I received a message from Sergei. He and Daniel Satchkov had developed software that could help scientists involved with Covid research. He offered me the software at no cost with hopes that it might help in my care of Covid patients. I was struck by the kindness of his offer.

17

(Ex. A-10, Dr. Guy Culpepper Ltr. at 1).  From that first conversation to this day, Dr. Culpepper has noted Sergei's care for others.  (Ex. A-10, Dr. Guy Culpepper Ltr. at 1).  He explains that in the past two years he has spoken with Sergei multiple times a week, and has found him to be consistently honest and fair-minded.  (Ex. A-10, Dr. Guy Culpepper Ltr. at 1).

In building WellAI, Sergei has rolled up his sleeves and done whatever hard work is necessary, however mundane or unglamorous.  Because the core work of the company falls within Daniel Satchkov's specific area of expertise, Sergei "gladly did all the boring work, encouraging [Daniel] to focus on research."  (Ex. A-27, Daniel Satchkov Ltr. at 1).  Meanwhile, Sergei studied coding, artificial intelligence, and machine learning so that he could contribute more to the company.  (PSR ¶¶ 50, 60).

### G.  Contributions to His Community

Sergei's kind and decent nature is perhaps best illustrated in his everyday acts of compassion and generosity.  He has not made splashy donations or sought status-enhancing awards or positions.  Sergei and Maryna have lived a modest, quiet life.  But the letters submitted on his behalf are replete with private gestures of kindness that no one was ever supposed to know about and that reveal Sergei's "tender heart."  (Ex. A-7, Judith Becker Ltr. at 1; Ex. A-12, Sandra Godfrey Ltr. at 2).  Sergei's "first inclination is to help when somebody he knows is in need." (Ex. A-28, Rudi Schadt Ltr. at 2).

The letters demonstrate Sergei's consistent desire to help friends, neighbors, colleagues, and even strangers.  To cite just a few examples:

- Olena Nakazawa, a friend of the Polevikovs, writes that she recently had a house fire: "Sergei didn't hesitate to offer his home for my daughter and me for several days.  We didn't bring any clothes or other things, but he helped us with the necessary shopping.  I will never forget his kindness."  (Ex. A-22, Olena Nakazawa Ltr. at 2).

18

- Olena's son Denis recalls that when he was granted an interview for an internship, Sergei immediately reached out to him, and invited Denis to Sergei's house to practice interviewing, discuss the position, and look at other opportunities.  Denis recalls that with Sergei's "help and mentorship," he received an offer.  (Ex. A-21, Denis Nakazawa Ltr. at 1).

- Neighbors Katie Hangley and Howard Simon write that when the neighborhood lost power for several days after a storm, Sergei and Maryna, who have a generator, made their freezer and Wi-Fi available to the neighbors.  Sergei even ran extension cords from his house across the street to their house so they could finish doing laundry they had started before the power went out.  (Ex. A-14, Katie Hangley & Howard Simon Ltr. at 1).

- Katsiaryna Tkachenka, a Belarusian woman now living in Poland, recalls: "When my son was born and my financial situation was very difficult, Sergei sent me, through his mother, a whole package of baby things.  It was a great help for my family during that time."  (Ex. A-30, Katsiaryna Tkachenka Ltr. at 1).

- Judith Becker recalls that when Sergei was a busy graduate student at SMU, he volunteered to help a fellow graduate student trying to care for her children (who spoke Russian) while studying.  Sergei "took them ice skating, to movies, read to them, and played games with them."  (Ex. A-7, Judith Becker Ltr. at 1).

The letters also reflect Sergei's kindness and respect in his dealings with his colleagues and business partners.  Julia Gu, a former colleague, explains that Sergei had strong relationships with his peers "because of his kindness and assistance to others no matter who they were."  (Ex. A-13, Julia Gu Ltr. at 1).  His partners and colleagues at WellAI likewise write that he treats everyone with respect and encouragement and brings out the best in them.  (*See* Ex. A-10, Dr. Guy Culpepper Ltr. at 1 (noting that Sergei is consistently "kind and respectful" with others); Ex. A-27, Daniel Satchkov Ltr. at 2 ("I felt firsthand how he can encourage even business partners to reach for higher goals[.]"); Ex. A-29, Rachel Schneider Ltr. at 2 (explaining that Sergei "takes care of the people in his real family and work family" and is "irreplaceable," the "rare manager" who really got to know her and brought out her "optimal performance")).

Sergei also has supported many worthy charities over the years, from volunteering as a tour guide for inner city children at the Museum of Math in Manhattan, to supporting his

daughter Brittany's work for the National Alliance on Mental Health, to mentoring students and paying their tuition for an investment management program, to making financial donations to the Russian Gift of Life program (which provides heart surgery to children). (PSR ¶ 51; Ex. A-7, Judith Becker Ltr. at 4; Ex. A-9, W. Michael Cox Ltr. at 3). His generosity with both time and money over the years are further evidence of his compassion for those in need.

## II.    Sergei's Offense Conduct and Conviction

From 2004 to 2019, Sergei worked as an analyst at an investment advisor. (PSR ¶ 64). In the course of his employment, Sergei had access on his computer to non-public information about when his employer was going to buy or sell securities on behalf of its clients. (PSR ¶ 10). From 2014 to 2019, Sergei abused his employer's trust by misappropriating that information to trade for his own benefit by front-running. (PSR ¶ 10). During that period, he routinely bought or sold securities on his own behalf in advance of his employer's larger trades. (PSR ¶¶ 10, 12). By doing so, he personally benefitted from the price movements that resulted when his employer executed its trades on behalf of its clients. (PSR ¶ 10). He knew what he was doing was wrong and illegal, and he concealed it from his employer. (PSR ¶ 18). Sergei received proceeds of $8,564,977 from his front-running conduct. (PSR ¶ 19).

In September 2021, Sergei was arrested on a criminal complaint. (PSR ¶ 6). He immediately accepted responsibility for his conduct, and did not require the government to seek an indictment. (PSR ¶ 4). Sergei pled guilty to securities fraud on December 15, 2021, and consented to a forfeiture order in the amount of $8,564,977. (PSR ¶¶ 4, 5).

## III.    The Consequences of Sergei's Conviction

Sergei fully accepts that he has brought this prosecution on himself by abusing his employer's trust and engaging in front-running. (Ex. A-1, Sergei Polevikov Ltr. at 1). The consequences of his conviction, including a term of incarceration, are of Sergei's own making.

That said, we respectfully submit that the severe consequences that he has faced and will continue to face in addition to any prison term are significant when the Court considers the appropriate sentence in this case.

Sergei has paid the full $8,564,977 forfeiture judgment reflecting the proceeds from his front-running. He has consented to injunctive relief in a parallel action filed by the Securities and Exchange Commission. He will never again work in the securities industry and his future earning potential is severely diminished.

Far worse, ███████████████████████████████████████ as a result of his conviction. ████████████████████████████



████████████████████████ Maryna, who holds no United States degree or credential and has been out of the workforce for decades, has taken a part-time, minimum wage job, and will soon be forced to support the family financially while parenting E██ alone. (Ex. A-2, Maryna Arystava Ltr. at 5).

In addition, Sergei faces the reality that he will be unable to help his parents when they most need him: they are in their 70s and have significant health issues, and his mother is a refugee. Valentina writes that when Sergei was arrested "[t]he world collapsed, and so did our hope for support, encouragement, and help in our old age. All that's left is to cry and squirm with heartache." (Ex. A-5, Valentina Polevikova Ltr. at 4).

Sergei is tortured by the damage he has caused. ██████████████████████████

████████████████████████████████████████████████████ (Ex. A-1,

Sergei Polevikov Ltr. at 2; Ex. A-9, W. Michael Cox Ltr. at 4-5; PSR ¶ 57).

## ARGUMENT

### I.      The Court Should Impose a Sentence of at Most Two Years

Section 3553(a) requires the Court to impose a sentence "sufficient, but not greater than

necessary" to accomplish several objectives: (A) "to reflect the seriousness of the offense, to

promote respect for the law, and to provide just punishment for the offense"; (B) "to afford

adequate deterrence to criminal conduct"; (C) "to protect the public from further crimes of the

defendant"; and (D) "to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner." 18 U.S.C.

§ 3553(a)(2). In determining the sentence, the Court also must consider

- "the nature and circumstances of the offense and the history and characteristics of the defendant," § 3553(a)(1);

- "the kinds of sentences available," § 3553(a)(3);

- "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines," § 3553(a)(4); and

- "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6).

An incarceratory sentence of at most two years accounts for these considerations and is sufficient

to achieve the objectives of sentencing.

In this case, Probation recommends a below-Guidelines sentence of 48 months because

of Sergei's health concerns and ████████████████████████████████. (PSR at

24). Probation notes that it does not recommend a more significant variance because of the

"high amount of loss and profit."  (PSR at 24).  We respectfully submit that the Guidelines, and

Probation's recommendation, place undue emphasis on the dollar amount gained as a result of

the offense and that there are significant mitigating factors that warrant a sentence of no more

than two years.  Those factors include Sergei's prompt and full acceptance of responsibility; his

extreme remorse; the consequences already suffered by Sergei and his family; the devastating

impact that even a two-year sentence will have on his family; his lifetime of hard work,

generosity, and demonstrated desire and ability to better the world; and the unwarranted

sentencing disparity with other defendants that would result from imposing a 48-month sentence.

### A.    The Guidelines Range Is Unreasonably High

In determining the appropriate sentence, the Court is required to consider the Guidelines

range for the offense.  18 U.S.C. § 3553(a)(4).  But courts have repeatedly recognized that the

applicable Guidelines are deeply flawed and have regularly disregarded those Guidelines when

imposing sentences in insider trading cases.  In insider trading cases, Guidelines sentences are

the rare exception, and substantial downward variances are common.  A substantial variance is

no less warranted here.

#### 1.   *The Guidelines' emphasis on the amount of gain yields a draconian range.*

As set forth in the PSR, and consistent with the plea agreement, Sergei is in criminal

history category I and has a total offense level of 25.  (PSR at 4).  That offense level is composed

of a base offense level of eight, plus a two-level increase for abuse of trust, plus an 18-level

increase based on the gain amount, minus three levels for acceptance of responsibility.  (PSR at

3-4).  The gain amount thus accounts for 72% of the total offense level, yielding a Guidelines

range of 57-71 months' imprisonment.  (PSR at 4).

In recent years, courts within this Circuit have recognized again and again that the Guidelines' nearly singular focus on loss or gain from economic crimes leads to draconian and irrational results, and as a result have regularly rejected Guidelines sentences out of hand.  "By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face."  *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (Rakoff, J.).  *See also United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) (recognizing, prior to *Booker*, that the "Guidelines place undue weight on the amount of loss involved in the fraud," and that "[i]n many cases, including this one, the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence"); *United States v. Johnson*, No. 16-CR-457-1, 2018 WL 1997975, at *3-4 (E.D.N.Y. Apr. 27, 2018) (Garaufis, J.) (concluding that "the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime," and joining the "lengthy list of judges, practitioners, scholars, and other commentators" who have "urged the Sentencing Commission to right this grievous wrong"); Sentencing Tr. at 23:1-12, *United States v. Faibish*, No. 12 Cr. 265 (E.D.N.Y. Mar. 10, 2016) (Vitaliano, J.), ECF No. 271 ("There is certainly no secret . . . that I subscribe to the views of a whole host of judges who have said so publicly and scores of others who have bumbled and grumbled about it privately, that the guidelines, even with its slight revisions, are just mindlessly accelerated once you have numbers of any size added in the loss or gain table. It just – it is the tail of the dog wags everything else.").

24

In fact, the Second Circuit has recognized that "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). In *Algahaim*, the Circuit found no error in the defendant's sentence, but nevertheless remanded the case for the express purpose of "permit[ting] the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence." *Id*. In so doing, the Court noted that the approach taken by the Sentencing Commission—in which the loss amount is the "principal determinant" of the sentencing range—is "unknown to other sentencing systems," and that its "unusualness is a circumstance that a sentencing court is entitled to consider." *Id*. (citing *Kimbrough v. United States*, 552 U.S. 85, 101 (2007), for the proposition that a "sentencing judge may make a non-Guidelines sentence if the judge disagrees with a Commission's policy determination"). *See also United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring) (explaining that the loss Guideline is "fundamentally flawed, especially as loss amounts climb," and that "[t]he higher the loss amount, the more distorted is the guideline's advice to sentencing judges").

This is a case in which the gain calculation grossly distorts the Guidelines range. The Commentary to Guideline § 2B1.4 acknowledges that in insider trading cases "the victims and their losses are difficult if not impossible to identify." As a result, the Guideline employs the "gain" amount instead of loss amount. § 2B1.4, Cmt. App. Note 2. Yet this calculation—which overwhelms all other factors and drives the advisory sentence—treats the gain in an insider trading case no differently than the gain in a fraud scheme where victims have lost their life

savings.  The Guidelines thus yield an excessive sentencing range that is disconnected from the objectives of sentencing.

> ### 2.  *Insider trading sentences are almost uniformly below-Guidelines.*

Given the fundamental flaws in the Guidelines calculations for insider trading cases, it is no surprise that Guidelines sentences are almost unheard of in those cases.  According to the Sentencing Commission's published data, of the 105 defendants nationwide sentenced in 2016 through 2020 under U.S.S.G. § 2B1.4 (the insider trading Guideline), only four received Guidelines sentences.  The remaining 101 defendants—or 96%—received below-Guidelines sentences.[5]  Specifically:

- In 2020, only one of 10 defendants sentenced under § 2B1.4 received a Guidelines sentence;[6]

---

[5] These statistics are based on tables included in the U.S. Sentencing Commission's Annual Report and Sourcebook of Federal Sentencing Statistics for each relevant year, which are available on the Sentencing Commission's website.  *See* Sourcebook Archives, USSC, https://www.ussc.gov/research/sourcebook/archive.  For 2018-2020, the relevant tables (cited below) include a column reflecting the number of cases in which variances were granted without specifying whether the variances were upward or downward variances.  However, the Commission's website also provides an "interactive data analyzer" tool, which provides access to additional detail.  *See* https://ida.ussc.gov/analytics/saw.dll?Dashboard.  The statistics in the data analyzer tool are slightly different from those in the published tables, but the differences do not materially alter the analysis.  The data available through that tool reflect no upward variances for defendants sentenced under § 2B1.4 in the 2016-2020 period.  We note that the statistics above do not include sentences imposed in 2021 because 2021 data is not yet available through the interactive data analyzer tool.  However, the 2021 Annual Report and Sourcebook of Federal Sentencing Statistics, Table E-7, reflects that in 2021 there were seven defendants sentenced under § 2B1.4, of whom two received Guidelines sentences, three received § 5K1.1 departures, and two received variances.  2021 Annual Report and Sourcebook of Federal Sentencing Statistics, Table E-7, https://www.ussc.gov/research/sourcebook-2021.

[6] Of the remaining nine, one received a § 5K1.1 departure, one received a downward departure, and seven received variances.  2020 Annual Report and Sourcebook of Federal Sentencing Statistics, Table E-7, https://www.ussc.gov/research/sourcebook-2020.

- In 2019, none of the 35 defendants sentenced under § 2B1.4 received a Guidelines sentence;[7]

- In 2018, only one of the 31 defendants sentenced under § 2B1.4 received a Guidelines sentence;[8]

- In 2017, none of the 11 defendants sentenced under § 2B1.4 received a Guidelines sentence;[9] and

- In 2016, only two of the 18 defendants sentenced under § 2B1.4 received a Guidelines sentence.[10]

In short, courts almost always impose below-Guidelines sentences in § 2B1.4 cases, and often vary substantially from the Guidelines.[11]  In this case too, a substantial variance from the Guidelines is appropriate.

---

[7] Seven received § 5K1.1 departures, two received other downward departures, and 26 received variances.  2019 Annual Report and Sourcebook of Federal Sentencing Statistics, Table E-7, https://www.ussc.gov/research/sourcebook/archive/sourcebook-2019.

[8] Ten received § 5K1.1 departures, three received other downward departures, and 17 received variances.  2018 Annual Report and Sourcebook of Federal Sentencing Statistics, Table E-7, https://www.ussc.gov/research/sourcebook/archive/sourcebook-2018.

[9] Five received § 5K1.1 or other government-sponsored departures, one received a downward departure, and five received variances.  2017 Annual Report and Sourcebook of Federal Sentencing Statistics, Table 28, https://www.ussc.gov/research/sourcebook/archive/sourcebook-2017.

[10] Nine received § 5K1.1 or other government-sponsored departures, two received other downward departures, and five received variances.  2016 Annual Report and Sourcebook of Federal Sentencing Statistics, Table 28, https://www.ussc.gov/research/sourcebook/archive/sourcebook-2016.

[11] The Sentencing Commission does not publish statistics reflecting the extent of departures by Guideline.  Accordingly, there is no published statistic reflecting the average degree of variance specifically in insider trading cases.  But in the broader category of "Fraud/Theft/Embezzlement" in 2021, the mean extent of downward variances was 59.8 percent and the median extent of downward variances was 55.4 percent.  2021 Annual Report and Sourcebook of Federal Sentencing Statistics, Table 40, https://www.ussc.gov/research/sourcebook-2021.  A two-year sentence in this case would constitute a 57.9 percent downward variance from the bottom of the Guidelines range.

B.     **A Sentence of at Most Two Years Is Appropriate in Light of Sergei's Personal History and Characteristics**

When imposing sentence, the Court must consider the personal history and characteristics of the defendant.  As set forth above and in the many letters submitted on his behalf, Sergei has led a life defined by hard work and generosity to others—not only to family and friends, but also to coworkers, the community, and strangers—as well as tireless support of democracy and humanitarian efforts.

Sergei's positive impact on his family, his community, and the world does not change the facts of this case, but it does place them in perspective.  "[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."  *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (Rakoff, J.).  Sergei's decades of both sacrifice and kindness should weigh in the balance before the Court when it imposes sentence.  Likewise, Sergei's immediate and complete acceptance of responsibility—pleading guilty at the outset of the case and meeting his full forfeiture obligation in advance of sentencing—weigh in favor of a substantially below-Guidelines sentence.

Of particular significance here is the severe impact that an incarceratory sentence will have on Sergei's wife and children.  The Second Circuit has repeatedly emphasized that courts should consider the burden a sentence will impose on innocent family members.  *See, e.g.,* *United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) (affirming downward departure where the "removal of the father from this unit at this particular point in time would have a disastrous effect on the children in terms of possibilities of their education and upbringing"); *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) ("Extraordinary family circumstances are widely accepted as a valid reason for departure."); *United States v. Isola*, 548 F. App'x 723,

28

725 (2d Cir. 2013) (summary order) (identifying defendant's "family circumstances and the effects of his incarceration on his daughter" among factors to be considered under 18 U.S.C. § 3553(a)); *United States v. Bills*, 401 F. App'x 622, 624 (2d Cir. 2010) (summary order) (holding that "the likely effects of [defendant's] incarceration on her daughter" were "mitigating factors" appropriately considered under 18 U.S.C. § 3553(a)).

In recent years, several courts in this district have imposed substantially below-Guidelines sentences based in large part on the effect of imprisonment on the defendants' families. For example, in *United States v. Blaszczak*, the defendant was convicted after trial of engaging in a six-year insider trading offense. Judge Kaplan concluded that the defendant had "aggressively" pursued sources of inside information that he could sell and that he was "bold, unapologetic, and giddy about what he was doing." Sentencing Tr. at 62:15-24, *United States v. Blaszczak*, No. 17 Cr. 357 (S.D.N.Y. Sept. 13, 2018), ECF No. 412. The court calculated an offense level of 26, resulting in a sentencing range of 63-78 months (*id*. at 22:19-23:1) but imposed a prison sentence of just one year and one day because of the impact on the defendant's wife, who suffered from a degenerative eye disease. Judge Kaplan explained: "The wreckage that a long period of incarceration would wreak on her and on your son is horrifying to me. And the sentence I am going to impose on you is going to reflect that." (*Id*. at 70: 20-23).[12]

Similarly, following trial in *United States v. Chow*, Judge Woods calculated a Guidelines range of 63-78 months' imprisonment but imposed a prison sentence of only three months, based in part on the defendant's family circumstances. Judge Woods explained: "I also emphasize that

[12] In 2021, the Supreme Court vacated the judgment against defendant Blaszczak and remanded the case to the Second Circuit for further consideration in light of *Kelly v. United States*, 140 S. Ct. 1565 (2020). *United States v. Blaszczak*, 141 S. Ct. 1040 (2021). The appeal is pending in the Second Circuit.

Dr. Chow is a father with a family with young children, he has elderly parents who he supports. . . .  Here, Dr. Chow's commitment to, in particular his parents given their deteriorating health, I think is a significant factor that weighs in favor of a downward variance."  Sentencing Tr. at 82:24-83:6, *United States v. Chow*, No. 17 Cr. 667 (S.D.N.Y. Jan. 17, 2019), ECF No. 161.

In *United States v. Stewart*, defendant Robert Stewart engaged in a years-long insider trading offense, including continuing the scheme by having a co-conspirator make trades on his behalf to avoid detection after FINRA opened an inquiry.  Sentencing Tr. at 27:9-28:18, *United States v. Stewart,* No. 15 Cr. 287 (S.D.N.Y. May 4, 2016), ECF No. 95.  Judge Swain calculated a Guidelines range of 30-37 months but imposed a non-custodial sentence because the insider trading, although years-long, was anomalous (*id*. at 28:19-29:12), the defendant faced collateral consequences to his career and finances (*id*. at 31:5-14), he accepted responsibility (*id*. at 31:17-19), and he played a central role in his family, including as primary caregiver to his wife (*id*. at 29:13-30:1, 31:14-23).

We respectfully submit that in this case, as in *Blaszczak*, *Chow*, and *Stewart*, Sergei's family circumstances warrant a substantially below-Guidelines sentence.  We recognize that many defendants who come before the Court for sentencing have family members who will be affected by the sentence.  But that does not change the fact that in this case a lengthy sentence would have an unusually harsh impact on innocent members of Sergei's family.  *See Gall v. United States*, 552 U.S. 38, 47, 52 (2007) (recognizing that the sentencing judge must "consider every convicted person as an individual and every case as a unique study" and that "extraordinary" circumstances are not required to justify a non-Guidelines sentence (punctuation and citation omitted)).

As set forth above, Sergei plays a crucial role in caring for and supporting his family. Sergei's wife and daughters depend on him financially and otherwise.  While any term of imprisonment will profoundly affect them, a lengthy sentence could cause irreversible harm. Family and friends who have witnessed Sergei's bond with his children are deeply concerned about the impact of his imprisonment on them, ████████████████████████████
██ ████████████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
██████ There is no telling what years in prison will bring.  Further, Maryna has no family in the United States, and she will be left alone to bear the responsibility for both parenting and supporting ██████ while Sergei is in prison.  Maryna has been out of the workforce for decades and holds no U.S. degree.  As a result, she is unlikely to find anything other than minimum-wage employment to support herself and her daughters ████████████████████████████
██████

In addition, the letters reflect Sergei's critical role in supporting his aging parents and his brother's family, all of whom face serious peril due to their courageous opposition to a ruthless dictator.  Sergei's mother Valentina and his brother Yury are refugees in Lithuania, while his father remains in an increasingly dangerous Belarus.  Sergei has consistently provided both emotional and material assistance to them, supported their pro-democracy efforts, and cared for

---

[13] *See, e.g.,* Ex. A-2, Maryna Arystava Ltr. at 4-5; Ex. A-7, Judith Becker Ltr. at 4; Ex. A-8, Daniel Burnside Ltr. at 2; Ex. A-10, Dr. Guy Culpepper Ltr. at 2; Ex. A-13, Julia Gu Ltr. at 2; Ex. A-17, Alexandra Kishkovsky Ltr. at 2; Ex. A-18, Elizabeth Knudsen Ltr. at 1-3.

them personally.  The shock and stress of Sergei's arrest and the prospect of losing him for an extended term of years, particularly at a time when their lives are in tumult and their futures so uncertain, would be heart wrenching for Valentina, Viktor, and Yury.  As Valentina's letter bluntly states, her world collapsed when Sergei was arrested and she is struggling "not to go mad."  (Ex. A-5, Valentina Polevikova Ltr. at 4).  Although any term of imprisonment will be a severe hardship for Valentina, Viktor, and Yury, the prospect of regaining Sergei's companionship and support in two years or less could sustain them in this incredibly challenging time.

### C.   A Sentence of at Most Two Years Will Fully Serve the Objectives of Sentencing

The Court must fashion a sentence that is "sufficient, but not greater than necessary," to further the relevant purposes of sentencing, including "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," "to protect the public from further crimes of the defendant," and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A)-(D).  Given the circumstances present here, a sentence of no more than two years is sufficient to serve these purposes.

#### 1.   Sergei is a first-time offender who poses no danger of recidivism.

A lengthy sentence is not required to effect specific deterrence or to protect the public from further crimes of the defendant.  Sergei is a first-time offender.  As a result of the offense conduct, he has lost his reputation and livelihood.  He will never work in the securities industry again.  His family is in dire financial straits.  He has witnessed the trauma that his family has suffered from his arrest and prosecution.  Sergei is wracked by guilt over what he has done and anguish over the suffering he has caused to those he loves.  He poses no risk of reoffending.

    *2. A prison term of at most two years will promote respect for the law
    and effect general deterrence.*

An incarceratory sentence will constitute an extremely serious sanction. It will promote respect for the law and deter others in the industry from engaging in front-running. A sentence in excess of two years is not necessary to achieve these goals. This is particularly true given the substantial consequences that Sergei and his family already have suffered and will continue to suffer.

Courts routinely recognize that loss of career, reputation, income, and assets are sources of general deterrence that merit consideration in fashioning the sentence. Indeed, the Second Circuit has explained that "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (recognizing that the destruction of a defendant's career and livelihood "already visits substantial punishment on the defendant" and "therefore that the need for further deterrence . . . is lessened." (citation omitted)). For example, in a recent insider trading case, *United States v. Chow*, Judge Woods concluded that a substantial prison term was not necessary "given the many adverse collateral consequences that Dr. Chow already has suffered"— conviction as a felon, loss of his job and ownership interest in a fund that he founded, and a potential bar from the securities industry and further civil litigation. Sentencing Tr. at 82:17-24, *Chow,* No. 17 Cr. 667 (S.D.N.Y. Jan. 17, 2019). As noted above, Judge Woods imposed a sentence of just three months' imprisonment even though the Guidelines range was 63 to 78 months.

Many other courts have similarly found that significant financial, reputational, and career consequences mean that a shorter sentence is adequate for general deterrence. *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 187-88 (E.D.N.Y. 2016) (Block, J.) (collecting cases and

concluding that collateral consequences are properly considered under § 3553(a) at sentencing); Sentencing Tr. at 39:15-18, *United States v. Schulman*, No. 16 Cr. 442 (E.D.N.Y. Sept. 26, 2017) (Azrack, J.), ECF No. 155 ("I believe that the significant collateral effects of the defendant's [insider trading] conviction, including his likely disbarment, have already achieved the goal of deterrence."); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (Broderick, J.), *aff'd*, 31 F.3d 73 (2d Cir. 1994) (loss of defendant's business, assets, and income "constitutes a source of both individual and general deterrence"); Sentencing Tr. at 32:17-33:1, *United States v. Collins*, No. 07 Cr. 1170 (S.D.N.Y. July 15, 2013) (Preska, J.), ECF No. 244  (explaining that where defendant was a lawyer who had lost his standing in the community and his ability to make a living, "a lengthy prison sentence is not necessary for general deterrence of similarly situated individuals tempted to commit similar crimes particularly in light of the collateral consequences suffered" by the defendant); Sentencing Tr. at 66:21-25, *United States v. Graham*, No. 06 Cr. 137 (D. Conn. Apr. 30, 2009) (Droney, J.)  (noting that defendant "has already suffered a great deal, not only in his reputation among his family and friends, but also because of the end of what otherwise was a fine legal career and the loss of a hard earned profession").

Here, Sergei has forfeited the entire $8,564,977 in proceeds that he received from the offense conduct.  He has consented to injunctive relief in a pending case filed by the Securities and Exchange Commission and will never again work in the securities industry.  His conduct has been widely reported and has ruined his reputation in his community, as well as many of his business and personal relationships.  It has destroyed his family's financial security and severely impaired his future earning capacity.  In light of these consequences, a two-year prison sentence is more than sufficient to afford deterrence.

Further, the empirical evidence does not suggest that a longer sentence would have a greater deterrent effect; to the contrary, empirical research shows little relationship between sentence length and deterrence. *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006)*; see also* Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment Purposes),* 58 Stan. L. Rev. 67, 80 (2005) (recognizing that white-collar offenders "have many lawful alternatives and much to lose from being convicted, regardless of the penalty"); *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (Rakoff, J.) (noting that there is "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders"), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (summary order). In short, there is no reason to think that imposing a sentence beyond two years will have an additional deterrent effect.

### 3. A sentence of at most two years accounts for the seriousness of the offense.

Sergei has taken full responsibility for his unlawful conduct. As the letters submitted by his friends and family confirm, he has never tried to defend or minimize that conduct. (*See, e.g.,* Ex. A-8, Daniel Burnside Ltr. at 2). But despite the seriousness of the conduct, there are certain facts about the offense that support leniency.

First, Sergei's offense was not designed to cause a victim to sustain financial losses. He acknowledges and deeply regrets that he abused his employer's trust by engaging in front-running for years. There is no doubt that his family members, including his wife and children, have suffered greatly as a result of his conduct, and Sergei is tortured by the harm that he has inflicted. And there is no dispute that his front-running was a form of cheating; he had an unlawful and unfair advantage over other market participants. But his conduct, as immoral and

35

illegal as it was, is meaningfully different from other types of fraud in which defendants callously fleece vulnerable victims. As discussed in greater detail above, the Guidelines calculation is dominated by calculation of gain or loss, which fails to draw the distinction between Sergei's offense and a typical fraud offense with victims who are harmed financially.

Second, Sergei did not spend the proceeds of his crime on luxuries or to support a lavish lifestyle. Many individuals engaged in fraudulent conduct use their ill-gotten gains to live above their means and quickly dissipate the proceeds of their crime. Sergei, by contrast, largely saved the proceeds of his front-running for his family, and by all accounts, Sergei and Maryna have lived a modest life. (*See, e.g.,* Ex. A-7, Judith Becker Ltr. at 4; Ex. A-5, Valentina Polevikova Ltr. at 3; Ex. A-28, Rudi Schadt Ltr. at 2). Sergei consented to the full forfeiture sought by the Government, was in a position to satisfy that judgment fully in advance of sentencing, and he has done so.

Sergei accepts that he committed a serious crime and must face a substantial term of imprisonment. But we respectfully submit that the circumstances of the offense do not merit more than two years' imprisonment.

### 4. *A lengthier sentence would be counterproductive because educational programs available to Sergei in prison would not further his rehabilitation.*

Section 3553(a)(2)(D) also requires the Court to consider the need for the sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

As Judge Woods explained in *Chow*, this factor weighs "heavily against a significant incarceratory sentence" where a defendant, like Sergei, is highly educated with "strong work credentials and a plan to put himself on the right track." Sentencing Tr. at 80:14-20, No. 17 Cr. 667 (S.D.N.Y. Jan. 17, 2019). There is "little that he will gain from an extended incarceratory

36

sentence and . . . there is the prospect that there is much that he could lose" in terms of his education and employment prospects.  *Id.* at 80:20-23.  Sergei holds multiple advanced degrees and has demonstrated the desire and work ethic to continue his education on the job.  In the last two years, he has devoted his attention to learning about artificial intelligence and machine learning and using that knowledge to contribute meaningfully to society through WellAI.  As in *Chow*, an extended term of imprisonment will not advance, and will likely derail, those efforts.

Sergei's medical conditions also bear on the appropriate term of imprisonment.  As noted above,

### D.     A Sentence of at Most Two Years Will Avoid Unwarranted Sentencing Disparities

In determining the appropriate sentence, the Court is required to consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.  18 U.S.C. § 3553(a)(3)-(6).  A sentence of two years' imprisonment would place Sergei at the high end of the range of sentences for insider trading defendants in the last several years.  Any lengthier term of imprisonment would create unwarranted sentencing disparities.

From 2016-2020, the average prison term, nationwide, for non-cooperating defendants in criminal history category I sentenced under the insider trading Guideline was 11.19 months, and

75% of defendants received sentences of 16 months or less.  In the Second Circuit, the average

was 12.09 months, with 75% of defendants receiving sentences of 15 months or less.  In the

Southern District of New York, the average was 12.94 months, with 75% of defendants receiving

sentences of 20 months or less.  (Ex. B, March 20, 2022 Declaration of Crystal S. Yang ("Yang

Declaration") at ¶ 4 & Table 1).  Nationwide, 81% of non-cooperating defendants in criminal

history category I sentenced under the Guideline have received sentences of 20 months or less,

and 85% were sentenced to two years or less.  (Ex. B, Yang Declaration at ¶ 5 & Fig. 1).

Accordingly, a two-year prison sentence would be a significantly more severe sentence than the

vast majority of insider trading defendants have received.  Moreover, the 48-month sentence

recommended by probation *would be harsher than the sentences imposed on 98.65% of non-*

*cooperating defendants in criminal history category I sentenced under the insider trading*

*Guideline.*  (Ex. B, Yang Declaration at 4 (Fig. 1)).

Indeed, courts within this district have imposed substantially below-Guidelines sentences

of less than two years in insider trading cases even where the offense conduct spanned years,

produced millions of dollars in gain, or otherwise included aggravating factors.  For example:

- As noted above, in *Blaszczak*, the defendant was convicted after trial of engaging in a six-year insider trading scheme, in which he "aggressively" pursued sources of inside information that he could sell and that he was "bold, unapologetic, and giddy about what he was doing."  Sentencing Tr. at 62:15-24, *United States v. Blaszczak*, No. 17 Cr. 357 (S.D.N.Y. Sept. 13, 2018), ECF No. 412.  Judge Kaplan calculated an offense level of 26, resulting in a sentencing range of 63-78 months (*id.* 22:19-23:2), but imposed a prison sentence of just one year and one day because of the impact on the defendant's wife and son.  *Id.* at 70: 20-23).

- In *United States v. Cohen*, a former investment banker at Goldman Sachs pled guilty to a years-long conspiracy in which he repeatedly stole business information from his employer and clients and "provided a steady stream of secret information" to a co-conspirator, who paid him in cash.  Sentencing Tr. at 38, *United States v. Cohen*, No. 19 Cr. 741 (S.D.N.Y. June 9, 2020), ECF No. 48.  According to the government, Cohen was paid approximately $1 million in cash for the tips.  Gov't Sentencing Submission at 4, No. 19 Cr. 741 (S.D.N.Y. May 27, 2020), ECF No. 44.  The

"sophistication" of the scheme "included the use of prepaid, unregistered burner phones and speaking in code." Sentencing. Tr. at 38, *Cohen*. The court described the conduct as "brazen" and "the actions of someone who knew what he was doing was wrong and took every precaution to try to avoid detection." *Id*. at 39. The scheme resulted in several million dollars in gain (including $7 million on one deal) to Cohen's co-conspirators. Because most of the trading occurred in Europe, the government stipulated to a Guidelines range of 30-37 months' imprisonment, but the government noted that the Guidelines range would have been 57 to 71 months (the same Guidelines range Sergei faces) if the securities trades had been conducted in the U.S. *Id*. at 30-31. Judge Pauley imposed a non-custodial sentence of 12 months' home detention and community service. *Id*. at 44-45.

- In *United States v. Lavidas*, the defendant was convicted after trial for misappropriating corporate secrets, which he passed to various traders on three occasions over a three-year period, yielding gains to those traders of $7.3 million. Gov't Sentencing Submission at 4, *United States v. Lavidas*, 19 Cr. 716 (S.D.N.Y. June 16, 2020), ECF No. 115. The government and probation calculated a Guidelines range of 63 to 78 months. *Id*. Judge Cote noted that Lavidas had not expressed remorse or acknowledged any wrongdoing, despite the overwhelming evidence against him, but nevertheless imposed a sentence of a year and a day in prison. Sentencing Tr. at 49, 57-60, No. 19 Cr. 716 (S.D.N.Y. July 2, 2020), ECF No. 127.

- In *United States v. Chow*, the defendant provided material non-public information about the status of his negotiations with another company to his co-conspirator, resulting in $5 million in gains to the co-conspirator. Sentencing Tr. at 74, 81, *Chow*. Further, when asked about the trading, the defendant made statements to FINRA that the government characterized as blatant lies and that Judge Woods characterized as "problematic." *Id*. at 60:19-60:24, 62:2-62:9, 75:2-75:4. The government calculated a Guidelines range of 78 to 97 months' imprisonment and requested a sentence within that Guidelines range to reflect Chow's "egregious" conduct of abusing his "extraordinarily powerful position as the founder and leader of multi-*billion* dollar investment funds" to tip a friend and business associate "on numerous occasions," his "brazen lies intended to interfere with the investigation," and his failure to accept responsibility. Gov't Sentencing Submission at 2, 17, 22, No. 17 Cr. 667 (S.D.N.Y. Nov. 20, 2018), ECF No. 148. Probation calculated a Guidelines range of 78 to 97 months' imprisonment and recommended a sentence of 48 months' imprisonment. Def. Sentencing Submission at 10, No. 17 Cr. 667 (S.D.N.Y. Nov. 13, 2018), ECF No. 147. Judge Woods calculated a Guidelines range of 63 to 78 months' imprisonment but imposed a sentence of just *three months* in prison followed by nine month of home detention. Sentencing Tr. at 71:25-72:2, 73:2-73:14, *Chow*.

- In *United States v. Stewart*, the defendant engaged in a years-long insider trading scheme. When FINRA opened an inquiry into irregularities in trading ahead of a merger, the defendant continued the scheme by having his co-conspirator make trades on his behalf. Sentencing Tr. at 27:9-28:18, *United States v. Stewart,* No. 15 Cr. 287

(S.D.N.Y. May 4, 2016), ECF No. 95.  Judge Swain calculated a Guidelines range of 30-37 months but imposed a non-custodial sentence.  *Id.* at 26:21-23, 32:8-12.

Sergei recognizes that the volume and duration of his conduct calls for a sentence of imprisonment.  A two-year sentence—which is harsher than the sentence imposed on 85% of non-cooperating defendants in criminal history category I sentenced under the insider trading Guideline in recent years —would more than satisfy the need for just punishment and deterrence. A longer sentence would fail to account for the mitigating circumstances here, including his prompt and full acceptance of responsibility, his remorse, and the impact of Sergei's incarceration on his family.  Such a sentence would create unwarranted disparities between Sergei and other defendants who have engaged in similar (or more serious) conduct and received sentences of less than two years.

### E.   Any Term of Imprisonment Will Be Harsher as a Result of the Pandemic

The worst days of the COVID-19 pandemic are hopefully in the past, and Bureau of Prisons ("BOP") restrictions related to the pandemic appear to be loosening.  Even so, a prison sentence remains harsher as a result of the pandemic.  At many BOP facilities, visitation was suspended for much of the last two years.  Although visitation recently has been restored in many facilities, visitation policies remain restrictive, prohibiting contact and requiring social distancing between inmates and visitors.[14]  Additional outbreaks likely will lead to suspension of visitation (and potentially other programs) in the future.  Given Sergei's close relationship with his wife and daughters, any prison sentence without regular family visitation will be particularly severe for Sergei and his family.  *See, e.g.*, *United States v. Robles*, No. 08 Cr. 1114, 2021 WL

---

[14] *See, e.g.*, FCI Otisville Visitor Bulletin:  COVID-19 Visiting Procedures (effective March 10, 2022), available at https://www.bop.gov/locations/institutions/otv/otv_svsp_030222.pdf.

3524067, at *8 (S.D.N.Y. Aug. 10, 2021) (Engelmayer, J.) (concluding sentence reduction was warranted in part because the pandemic-related "harsh conditions of confinement," including suspension of visitation, made prison sentence "far more punishing than intended"); *United States v. Zhong*, 26 F.4th 536, 564 (2d Cir. 2022) ("We have recognized that the 'severity of the conditions of confinement' is a 'not unreasonable' basis for a court to impose a shorter sentence than might otherwise be warranted." (quoting *Stewart*, 590 F.3d at 144)).  We respectfully request that the Court consider this factor in determining a sentence sufficient, but not greater than necessary to serve the purposes of sentencing.

## II.    A Fine Is Not Warranted in This Case

We respectfully submit that Sergei's sentence should not include a fine.  Pursuant to 18 U.S.C. § 3572(a), the Court must consider, *inter alia*, the § 3553(a) factors and the following factors in determining whether to impose a fine and the amount of any fine:

> (1) the defendant's income, earning capacity, and financial resources, 18 U.S.C. § 3572(a)(1);
>
> (2) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose, 18 U.S.C. § 3572(a)(2), U.S.S.G. § 5E1.2(d)(3);
>
> (3) any pecuniary loss inflicted upon others as a result of the offense, 18 U.S.C. § 3572(a)(3), U.S.S.G. § 5E1.2(d)(1); and
>
> (4) the need to deprive the defendant of illegally obtained gains from the offense, 18 U.S.C. § 3572(a)(5), U.S.S.G. § 5E1.2(d)(1).

These factors strongly militate against a fine here.

First, Sergei's net worth is negative, and his career and earning potential have been decimated by his conviction.  As a result, he has no ability to pay a fine.  *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(a).

41

Second, Sergei already has forfeited all proceeds of the offense conduct.

Third, the conduct did not inflict an identifiable pecuniary loss upon others.

Fourth, any fine would impose a substantial burden not only on Sergei but also on Maryna and their children, who depend on him for financial support.  After many years out of the workforce caring for their children, his wife Maryna has taken a part-time, minimum-wage job.  Because she was educated in Belarus and has no U.S. degree or credential, her earning potential is severely limited.

Under these circumstances, a fine would not serve the purposes of § 3572(a).  Further, a fine is not necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, or afford adequate deterrence.  18 U.S.C. §§ 3553(a)(2)(A), (B), (C); U.S.S.G. § 5E1.2(d)(1).

## CONCLUSION

For the foregoing reasons, Sergei Polevikov respectfully requests that the Court impose

an incarceratory sentence of no more than two years.

Dated: New York, New York
      March 29, 2022

Respectfully submitted,

*/s/* Michael Gerber
Michael Gerber
Jeannie Rose Rubin
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 921-8399
Fax: (212) 764-3701
mgerber@lswlaw.com
rrubin@lswlaw.com

*Attorneys for Defendant Sergei Polevikov*